### URI v. HIRSCH et al.

(Circuit Court, W. D. Missouri, W. D.   July 6, 1903.)

1. EQUITY—ANSWER AS EVIDENCE—RESPONSIVENESS TO BILL.

Where a bill for infringement of a trade-mark alleged the use of a name by complainant as a trade-mark for a certain number of years, and that he had acquired the exclusive right thereto, and that defendants were fraudulently using such name in violation of his said right, and required answer under oath, averments in the answer fully stating all the facts with respect to the use of such name by defendants, showing that it was used by them long prior to the time when complainant claimed to have commenced its use, and the extent of their use, were directly responsive to the bill; and evidence in behalf of defendants as to such facts, which complainant was required to overcome by countervailing proof of two witnesses, or of one witness and efficient corroborating circumstances to entitle him to relief, even though the use made of the name by defendants was not such as to give them a trade-mark right therein.

2. TRADE-MARK—RIGHT TO PROTECTION IN EQUITY—FALSE REPRESENTATIONS.

In a suit for infringement of a trade-mark for whiskey, the testimony and exhibits of complainant showed that his trade-mark as registered and used òn his barrels and bottles contained a representation that his whiskey was made in Nelson county, Ky.; that he also conspicuously advertised such to be the fact by the markings on his packages, and by advertising matter, using cuts of a distillery, with the words "Old Style Nelson County Pure Rye," etc. It was shown without contradiction that he owned no distillery, that whiskey sold by him was purchased from rectifiers, was not made in Kentucky, and was not a pure rye or bourbon as represented, but a blended whiskey, flavored, and containing coloring matter, his trade-mark being stenciled on the barrels at his request. Held that, both his trade-mark and business being founded on false representations intended to deceive the public, a court of equity would not entertain a suit for their protection by enjoining another from infringing his trade-mark.

3. SAME.

Where a trade-mark contains false representations with respect to the article on which it is used, it will not be protected by a court of equity, and it is immaterial that the article may be as good as that which it is falsely represented to be.

4. SAME—SUIT FOR INFRINGEMENT—ISSUES.

Where a complainant, in his bill for infringement of a trade-mark, alleges that by reason of the care and skill used in the manufacture of

---

¶ 2. Misleading or false labels, see note to Raymond v. Baking-Powder Co.. 29 C. C. A. 250.

his goods, and their superior quality, and of his extensive advertising, his business has become large and profitable and his trade-mark valuable, and he offers evidence in support of such allegations, it is competent for defendant to show by cross-examination or otherwise, without pleading the same, that his goods are not as represented by his trade-mark or advertising, and that his business has been built up on false representations which deprive him of the right to relief in equity.

In Equity. Suit for infringement of trade-mark

Leon Block and John L. Peak, for complainant.
Neal & Eppstein, for defendants.

PHILIPS, District Judge. This is a bill of complaint for a violation of an alleged trade-mark of the complainant, in which it is alleged that the complainant, since the 15th day of April, 1892, has been engaged in compounding and selling a superior quality of spirituous liquors known as "R. H. Parker Rye," "R. H. Parker Whiskey," "Parker Rye," "Old Parker Rye," and "Parker Bourbon;" and that he has a common-law copyright and trade-mark in the names aforesaid; and that the defendants have improperly and fraudulently used the same in their trade and business. The material portions of the allegation of the bill and answer, for the purposes of this opinion, will be referred to hereafter.

The complainant in the bill required that the defendants answer under oath, which was done. It is a just rule in equity practice, where the complainant sees fit to put the defendant on oath in his answer, that unusual force and effect should be given to such answer. The accepted rule is that such answer has such force as evidence in behalf of the defendant that the burden is cast upon the complainant to overcome it by the testimony of two witnesses, or one witness corroborated by other facts and circumstances that persuasively outbalance such sworn answer. It is on this rule that the defendants claim, specially, that the answer pleading the prior use by the defendant in its trade of the name of "Old Parker" long anterior to the adoption by complainant of his alleged trade-mark, is not overcome by any countervailing evidence on behalf of the complainant. Counsel for complainant first undertake to meet this proposition by the suggestion that the rule in question applies only to the instance where the answer is strictly responsive to the allegations of the bill, and has no application to matters pleaded by way of avoidance. This is, in general, a correct proposition. The question therefore is, does the matter so pleaded in the answer amount to an avoidance? The rule is very concisely stated by Judge Deady, in Reid v. McCallister (C. C.) 49 Fed. 16, 17, which has been frequently cited with approval by text writers and courts:

"The answer, so far as it is responsive to the bill, is evidence for the defendant making it; but if the defendant, by his answer, admits a fact alleged in the bill, and then sets up another matter in avoidance thereof, this matter in avoidance is not responsive to the bill, and his answer is not evidence of it. Clarke v. White, 12 Pet. 190 [9 L. Ed. 1046]; Tilghman v. Tilghman, Baldw. 494 [Fed. Cas. No. 14,045]; Randall v. Phillips, 3 Mason, 383 [Fed. Cas. No. 11,555]; McCoy v. Rhodes, 11 How. 140 [13 L. Ed. 634]; Hart v. Ten Eyck, 2 Johns. Ch. 87. In this connection, matter in avoidance is some-

thing subsequent to and distinct from or dehors the fact admitted, but, if the admission and avoidance constitute one single ,fact or transaction, the an-swer is evidence of both. Hart v. Ten Eyck, 2 Johns. Ch. 88, and note."

The rule is laid down in 1 Encyclopædia of Pleading and Practice, p. 913, that:

"The answer of the defendant is evidence for him, not only when it is re-sponsive to the call of the bill for discovery, but also when it is necessarily connected with the responsive matter or explanatory of it."

And on page 918 it is said:

"It is considered a test of responsiveness whether, as a witness upon cross-examination, the defendant could be cross-examined as to the matter which he states in anticipation of his defense on a trial at law. A responsive denial of the averments of the bill is not made any less so by setting forth all the facts, though some new matter may be incidentally introduced thereby."

So it is held in Comstock v. Herron et al. (C. C.) 45 Fed. 660, that where a bill against executors, etc., under a will, charges them with having delayed, neglected, and refused to invest certain funds as di-rected by the will, and to pay to complainant the income, the aver-ments in the answer that the defendants' conduct was known to and approved by complainant, and that she had not until recently requested the investment to be made, are responsive to the whole charges, "with reference to which the respondents have the right to vindicate themselves."

In American Mortgage Company v. O'Harra, 56 Fed. 278, 5 C. C. A. 502, 15 U. S. App. 79, where the bill charged a mistake in the mortgage respecting a part of the land in question to be conveyed, which was sought to be reformed and the mortgage foreclosed, and the defendants were required to answer under oath, the answer, al-leging that one of the defendants had purchased the property, with-out notice of the mistake, for a valuable consideration, and therefore was an innocent purchaser, held responsive to the bill.

So in Mann v. Betterly, 21 Vt. 326, to a bill which alleged that the release of a bond conditioned for the support of the orator was ob-tained by the defendant for a grossly inadequate consideration, the answer, denying inadequacy, and setting forth the previous arrange-ment which led to the execution of the bond, the maintenance of the orator from that time to the canceling of the bond, and the amount paid for the release, was held to be responsive and was competent evi-dence.

Likewise, where a bill charged a partnership between parties claim-ing a share of the profits, the answer stating payment to the plaintiff was held to be evidence for the defendant.

The term "avoidance" in pleading implies some admission in ef-fect of the existence, prima facie, of a cause of action in the com-plainant at some time, and some fact supervenient which avoids it in favor of the defendant. It is also a recognized rule in pleading that whatever fact is reasonably within the issues tendered by the com-plainant may be met by a general denial, and therefore any fact, ex-istent at the time of the institution of the suit, included within the issues tendered or connected therewith, may be pleaded in the an-swer as responsive thereto.

In patent cases, germane to trade-mark cases, involved in the issue presented by a bill for infringement is the right to the exclusive use of the patented invention. It is responsive to such bill to plead a prior invention or user, and such prior user is responsive to the bill, without special plea. Kennedy v. Solar Refining Company (C. C.) 69 Fed. 716. See, also, Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438; Parks v. Booth, 102 U. S. 103, 26 L. Ed. 54.

An analysis of the bill at bar shows that the complainant claims that he had the exclusive right, at least as far back as 1892, to the use of the alleged names as a trade-mark, "and that no other person, firm, or corporation has the right to deal in or sell any such liquors, under any of said names, not made by your orator; * * * that the complainant has the exclusive right to said names 'Parker' and 'R. H. Parker' as used in connection with the manufacture, compounding, handling, and sale of said spirituous liquors, as the true name, and indicating origin and ownership." The bill tendered directly the issue that the defendants' use of the name of "Parker" originated in a fraudulent purpose to reap the benefit of the reputation of complainant's whiskeys, with the allegation that the defendants for a long time had been so engaged. Certainly, therefore, it was responsive to these allegations for the defendants to state when they began the use of the designation of "Old Parker" in the sale of liquors; how they had employed the same, and to what extent. The defendants could have been cross-examined as witnesses, when testifying, even without having pleaded the fact of its prior user, respecting the time or occasions when they used it. It was involved in the very matters pleaded in the bill. In short, the very purpose of the complainant in requiring the answer to be made under oath was to enforce a disclosure, by the defendants, as to all the facts within their knowledge respecting their use of the name "Old Parker." It was the duty, not only to the complainant, but to the defendants' own consciences, when put on oath by the demand of the bill, to state the whole truth and circumstances respecting their use of the name in question in their trade. It was therefore directly responsive to the bill, after having taken issue on the material allegations of the bill, to answer, as defendants did, that they had been engaged for many years—since 1879—in the handling, compounding, manufacturing, and selling of spirituous liquors, and for many years were engaged in business in the city of Leadville, state of Colorado; that while in the state of Colorado they marked and branded packages of liquor with the name of "Old Parker," which name was stenciled on the packages of liquor merely to distinguish liquors sold and handled by them; that they were informed and believed that their employés who stenciled the name "Old Parker" on barrels and packages of liquor oftentimes stenciled in connection therewith other names, sometimes making the full stenciling appear as "Old Parker Rye Whiskey," "Pure Old Rye Whiskey," and other names which the defendants do not fully recollect; that they continued to use such marks for some time in 1881 or 1882, according to their recollection, and have continuously so used said name, in combination,

as aforesaid, with other words, until the present time; that when they came to Kansas City, Mo., in 1885, they continued the use of this name, and that their use thereof was long prior to the time when complainant claims to have so used the same or any part thereof; that they did not know, at the time when they began using the name, of its use in any form or manner by complainant, but understood and believed that they had the right to so adopt the use of said name, and that they acquired, by long and continued use of said name as a trade-mark, a property, interest, right, and privilege to use said name, against this complainant and all persons whomsoever.

As the bill called for this answer under oath, the defendants could have stood upon it until this evidence was overcome by countervailing proof of two witnesses, or one witness and some efficient corroborating circumstance. Morrison v. Durr, 122 U. S. 518, 7 Sup. Ct. 1215, 30 L. Ed. 1225; Peeler v. Lathrop, 48 Fed. 788, 1 C. C. A. 93. This record fails to show one word of such countervailing evidence offered by the complainant on this issue. The defendants, however, went further, and testified to such prior use, supplemented by other evidence, while the complainant contents himself on the hearing with the criticism that the defendants failed and refused to produce in evidence their books showing sales of liquors under the name of "Old Parker." Had this issue stood on the answer without oath thereto required by the complainant, this criticism would have force. But, as observed by Judge Morrow, speaking for the Court of Appeals for the Ninth Circuit, in American Mortgage Co. v. O'Harra, 56 Fed. 278, 281, 5 C. C. A. 502, where the answer was verified by oath of the defendant responsive to the allegations of the bill, and therefore should be overcome by the satisfactory evidence of two witnesses, or of one witness corroborated by circumstances which are equivalent in weight to another, while "there are some suspicious circumstances conected with the transaction, such, for instance, as the conduct of the attorneys who examined the title and drew up the deed for Rourke; the contradiction between the allegations of the answer and the testimony of the defendant as to the amount paid for the land, and the sums for which two notes were given for deferred payments; the fact that Rourke had other business relations with Smith, and that the two were frequently seen together about the time Rourke purchased the land from Smith, following closely after the transfer of the title by deed from O'Harra to Smith—yet these circumstances are not sufficient to overcome the positive evidence in favor of the integrity of the transaction, so far as they relate to the title acquired by the defendant Rourke." Citing Morrison v. Durr, 122 U. S. 518, 7 Sup. Ct. 1215, 30 L. Ed. 1225.

If it be conceded that, as the answer states the names employed by defendants, designating their whiskeys, "possess no special significance as indicating a grade and quality of goods of class and kind aforesaid by defendants," this would not show such appropriation of the name "Old Parker" as would entitle the defendants to cross-affirmative relief, establishing in them a trade-mark right, yet the fact should avail to disentitle the complainant to any relief for damages of any consequence, and as affecting the costs, when it appears that,

within two months or so of the filing of the bill, the defendants had no knowledge of the complainant's claim to such trade-mark, and such fact was not known to the trade in Kansas City, Mo. It also appears from the evidence that the only sales shown by complainant to have been made by the defendants were two barrels, early in 1901, under the style of "Old Parker," and, although made by a man in defendants' employ formerly in the employ of the complainant, it further appears that the fact of such former employment by this agent was not known to the defendants, and there was no representation made by this agent, and no device employed indicating, that the goods were of the complainant's manufacture. Superadded to which, the testimony of the purchaser shows that he well understood, in making these purchases, that the liquor was not from the complainant's house. In short, the case presented on the face of the bill, and that made out by proof, not only indicates an utter recklessness in pleading on the part of the complainant, but shows that the litigation, so offensively provoked by him, might appropriately be described by the Latin phrase, "Rixatur de lana a caprina."

Be all this as it may, a state of facts was devolved by the evidence which, in my judgment, should deny to the complainant the assistance of a court of equity. The complainant in his testimony presented, and had filed as exhibits, his trade-mark published in Mida's National Register of Trade Marks, etc., which reads as follows: "Old Style. [in Monogram] U. & C. R. H. Parker. 5th Ky. Nelson Co." "Used Since April 15, 1892." It is conceded in the evidence that this referred to the Fifth Kentucky collection district of internal revenue, and to Nelson county, Ky. It also appears, from complainant's testimony and the exhibits that he published, pictures or cuts of bottles in advertising said whiskey, in what he calls a "booklet," were stamped the words "R. H. Parker. Old Style Nelson Co. Ky." on one of the jugs or bottles. He also employed, in advertising his said company, metal plates or cuts (Exhibit No. 14), which shows stamped, on one of the bottles used in the business, conspicuously, the words "R. H. Parker," with a representation of a distillery, underneath which were the words "Old Style Nelson Co. Pure Rye," and on a jug the words "R. H. Parker Old Style Nelson Co. Ky.," which he testified had been distributed generally in his trade.

In his Exhibit No. 15 he presented, as used in his business, photographs of barrels, with stamps on what he calls the "stamp end" and the "commercial end." On the stamp end of the barrel this exhibit shows the wholesale liquor dealer's stamp, and the numbers cut on the stamp end of the barrel with steel dies, in large words on the barrel, "N. M. Uri & Co. Wholesale Liquor Dealers. 219 & 221 W. Main Street, Louisville, Ky.," with a caution label reading "Distillery 5th District, Nelson County, Kentucky," and in a circle the words "Old Style. [and in the form of a monogram] U. & Co. R. H. Parker. 5th Ky. Nelson Co." Underneath said caution are the words, "The trade and public generally are cautioned against counterfeits of this brand. None is genuine without the name of N. M. Uri & Co. in the Government stamp," also the word "Bourbon" to the right, burned in large letters. On the commercial end, in a circle,

the following words are burned into the barrel: "Old Style. [and in the form of a monogram] U. & Co. R. H. Parker. 5th Ky. Nelson Co."

Exhibit No. 17 is the photograph of another barrel, to the same effect as Exhibit 15, with the exception that the word "Rye" is used in the place of "Bourbon" on the commercial end.

All of which, developed in evidence by complainant as a part of his case, goes to show that, as a part of his registered notice in Mida's Trade Mark Register, on his bottles, jugs, barrels, and metallic plates distributed for advertisement, he conspicuously advertised to the world that his liquors being sold were manufactured in Nelson county, Ky. They can have no other meaning.

The testimony of Louis Block, Jr., a wholesale liquor dealer in Cincinnati, Ohio, of long experience, and well informed as to the distilleries in Kentucky, without contradiction, was to the effect that Nelson county, Ky., was among the large manufacturers of liquor, and that, while of a quality not superior to other manufactures, it was regarded as of high class. His testimony, without contradiction, further shows that his house furnished large quantities of liquors to the complainant, as rectified whiskey, containing coloring matter; that such rectifying process was carried on on Sycamore street, in the city of Cincinnati; and that, at the request and instance of the complainant, he placed the brand "Old Style, N. M. U" (monogram) "R. H. Parker, 5th Ky., Nelson Co." on the barrels, etc.; that the complainant had the brand made and shipped to his house, with directions to keep it in his store, and use it for complainant whenever ordered; and that from April, 1892, until his house discontinued the rectifying business, in January, 1902, he continued to use this brand for the complainant; and that all the whiskey placed in these barrels bearing said brands was made in Cincinnati, and perhaps Pennsylvania, and not from any distillery in Nelson county, Ky., and that the complainant had no distillery in Nelson county, Ky.

On the cross-examination of the complainant as a witness in this case, he was asked whether or not he used Kentucky ryes in compounding his Kentucky brand of Parker Rye Whiskey. He refused to answer this question, on the ground that it was not necessary for him to give his recipes. He was then asked to examine his said Exhibit 16, filed with his deposition, and tell why that caution is headed, "Distillery 5th District Nelson County, Kentucky." His answer was: "For the reasons that I did it." He was then asked if it was a fact that those caution labels were put on whiskey placed and marked by him under the name "Parker," which was distilled in Nelson county, Ky. His answer was: "I refuse to answer, on the advice of counsel." The suggestion of complainant's counsel, that a refusal to answer is justified by the fact that he understood by the question that its purpose was to pry into his secret of compounding his liquors, is contradicted by the fact that upon said answer defendants' counsel stated to him, "I am not asking the witness anything about the component parts of the whiskey in this question; and I now repeat the question as above asked;" to which the complainant replied: "I refuse to answer, under the advice of my counsel."

The pretense set forth for not answering these questions is so shallow as to contradict itself. He had, as already shown, in every conceivable form and manner, advertised to the public the fact that his liquors were of the manufacture of Nelson county, Ky.; and as he had thereby stated that he was employing them, whether singly or in combination with other liquors, why then say that he refused to answer because it would be giving his recipe? No other reasonable construction can be placed upon it than a purpose to evade an answer which might convict him of exploiting his goods under an alleged trade-mark under the false pretense that his liquors so labeled and stamped were made in Nelson county, Ky. Even without this silent admission on his part, the fact remains that the Cincinnati house which extensively rectified and stamped his whiskeys for use in his business, as heretofore stated, at his request, shows beyond controversy that he was consciously practicing upon the public a fraud under the claim now asserted of a trade-mark protection.

It has been expressly held by the Supreme Court, in Manhattan Medicine Company v. Wood, 108 U. S. 203, 218, 225, 2 Sup. Ct. 436, 27 L. Ed. 706, that:

"If one affix to goods of his own manufacture signs or marks which indicate that they are the manufacture of others, he is deceiving the public, and attempting to pass upon them goods as possessing a quality and merit which another's skill has given to similar articles, and which his own manufacture does not possess in the estimation of purchasers. To put forth a statement, therefore, in the form of a circular or label attached to an article, that it is manufactured in a particular place, by a person whose manufacture there had acquired a great reputation, when in fact it is manufactured by a different person at a different place, is a fraud upon the public which no court of equity will countenance. * * * Indeed, it is but an application of the common maxim that he who seeks equity must present himself in court with clean hands. If his case discloses fraud or deception or misrepresentation on his part, relief there will be denied. * * * It is a clear rule, laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth."

—Quoting from the leading English case of The Leather Cloth Company v. The American Leather Cloth Company, 4 De G. J. & S. 137, 11 House of Lords Cases, 523, the substance of which is expressed by Mr. Justice Shiras in the recent case of Worden & Company v. California Fig Syrup Company, 23 Sup. Ct. 162, 47 L. Ed. ——, as follows:

"We find, however, more solidity in the contention, on behalf of the appellants, that, when the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representation; that, if the plaintiff makes a material false statement in connection with the property which he seeks to protect, he loses his right to claim the assistance of a court of equity; that, where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed in it; or, in other words, the right to the exclusive use of it cannot be maintained."

The court, in this late opinion, cites with approval the following rulings: Connell et al. v. Reed et al., 128 Mass. 477, 35 Am. Rep.

397, where the plaintiff sought to establish the exclusive right to the words "East Indian" as applied to his remedy, in which Chief Justice Gray said:

"The conclusive answer to this suit is that the plaintiffs have adopted and used these words to denote, and to indicate to the public, that the medicines were used in the East Indies, and that the formula for them was obtained there, neither of which is the fact. Under these circumstances, to maintain this bill would be to lend the aid of the court to a scheme to defraud the public."

In Siegert et al. v. Abbott et al., 61 Md. 276, 48 Am. Rep. 101, where the matter in controversy was in respect of a trade-mark, entitled "Angostura Bitters," purporting to have been prepared by Dr. Siegert at Angostura, Trinidad, which was a falsehood, the court said:

"It is a general rule, in cases of this kind, that courts of equity will not interfere by injunction where there is any lack of truth in the plaintiff's case; that is, where there is any misrepresentation in his trade-mark or labels."

In Prince Manufacturing Company v. Prince's Metallic Paint Company, 135 N. Y. 24, 31 N. E. 990, 17 L. R. A. 129, an injunction to protect a trade-mark was refused because of a false representation as to the place from which the ore was obtained. The court said:

"Any material misrepresentation in a label or trade-mark as to the person by whom the article is manufactured, or as to the place where manufactured, or as to the materials composing it, or any other material false representation, deprives a party of the right to relief in equity. The courts do not, in such cases, take into consideration the attitude of the defendant. * * * And although the false article is as good as the true one, 'the privilege of deceiving the public, even for its own benefit, is not a legitimate subject of commerce.'"

The court also cites with approval the English case of Pidding v. How, 8 Simon's Ch. 476, in which it appeared that the plaintiff had made a new character of mixed tea, which he sold under the name of "Howqua's Mixture." But as he had made false statements to the public as to the mode and place of making the mixture, the injunction was denied, the court saying:

"It is a clear rule, laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth. And as the plaintiff in this case has thought fit to mix up that which may be true with that which is false, in introducing his tea to the public, my opinion is that, unless he establish his title at law, the court cannot interfere on his behalf."

This case also holds that, no matter if the course pursued by the defendant was not a proper one, it does not excuse the fraud of the complainant.

The suggestion of the learned counsel for complainant, at the hearing, that there is no proper inference that any fraud was intended by the complainant in thus advertising his liquors as of Nelson county, Ky., manufacture, inasmuch as Jefferson county or Bourbon county, Ky., whiskey was as good, if not better, and no injury was in fact done to the public, is effectually met by Judge Taft, in the important case of Krauss v. Peebles' Sons Company (C. C.) 58 Fed. 585. In that case the complainant employed, in his labels and notices, representations indicating to the public that his whiskeys

were made by James E. Pepper & Co., which had attained a wide and good reputation. Judge Taft said:

"The words 'Old Pepper Whiskey,' placed upon a bottle, are an express statement that the bottle contains 'Old Pepper Whiskey.' The shield trademark, and the words which accompany it, were obviously first adopted for use upon barrel packages of Old Pepper whiskey, but to place such a trademark upon a bottle is to say to the purchaser that the contents were drawn from such barrels. 'Consumers should satisfy themselves that the whiskey is distilled by Jas. E. Pepper & Co.' Can any construction of these words, however ingenious, escape the meaning that the whiskey contained in the bottle upon which they are placed is whiskey distilled by Jas. E. Pepper & Co.?"

After referring to the label, he said:

"What whiskey? The whiskey contained in this bottle, of course, which the purchasing public has been assured by the gold label was Old Pepper whiskey, distilled by Jas. E. Pepper & Co. * * * The purpose of stating that the whiskey was bottled at the distillery warehouse, therefore, is to clinch the proof that nothing is contained in the bottle but whiskey made by Jas. E. Pepper & Co., unadulterated by mixture with it of anything else. * * * To bottle such a mixture, and sell it under the trade label and caution notices above referred to, is a false representation, and a fraud upon the purchasing public. A court of equity cannot protect property in a trademark thus fraudulently used. It is not material whether the foreign whiskey mixed with Pepper's is as good or better whiskey than Pepper's or whether the mixture is better than pure Pepper whiskey. The public are entitled to a true statement as to the origin of the whiskey, if any statement is made at all. The complainants and Pepper are not to be protected in a deception of the public, even if it works to the advantage of the public."

Further on, he asserted:

"The reason why relief is refused the complainant in such cases has nothing to do with the defendant's rights or wrongs. It is that the court will not protect a fraudulent business of a plaintiff, however much in the wrong the defendant may be."

The complainant's own testimony in the case at bar shows that his liquors were what is known as "blended," and artificially flavored, although he asserts on some of his packages and receptacles that it is "Old Style 5th Ky. Nelson Co.," indicating to the public that it was made after the old style handmade mash; and in any event it was a false statement if the whiskey was not of Nelson county, Ky., distillery; and it was false if blended with other whiskeys.

Client and counsel, defending the blending and flavoring of complainant's liquors, likened it to a bouquet of various flowers, the combination only accentuating the odor, without diminishing the quality. While it may hold good in botany that a rose would smell as sweet by any other name, yet, in law, a simulation may be a flagrant fraud. If my sense of smell prefers American Beauty rose, and the florist, under a label indicating essense of "American Beauty Rose," should sell me a blended compound of American Beauty, rosemary, rose of Jericho, and sunflower, the deception would be dishonest in morals, and fraudulent in law. Commercial integrity demands that the buyer shall receive what the seller's label on his goods denotes, nothing more and nothing less. This is what equity exacts, which is but another name for fair dealing and good conscience.

In the Worden & Company Case, supra, Mr. Justice Shiras, speak-

123 F.—37

ing of the continued use of the label on the article by the name of "Syrup of Figs" after the extract of fig juice, originally used in the manufacture thereof, had proven deleterious and been abandoned, said:

"Even if the term was honestly applied in the first instance, as descriptive, it would none the less be deceptive and misleading when, as is shown in the present case, it ceased to be a truthful statement of the nature of the compound."

Further on the court observed:

"That the complainant company, years after it had established a popular demand for its product, issued statements, in medical journals and newspapers and circulars, that the medical properties of their compound were derived from senna, does not relieve it from the charge of deceit and misrepresentation to the public. Such publications went only to giving information to wholesale dealers. The company, by the use of the terms of its so-called trade-mark on its bottles, wrappers, and cartons, continued to appeal to the consumers, out of whose credulity came the profits of their business."

The dernier suggestion of counsel for complainant, to escape from the fatal embarrassment of this situation in a court of equity, is that no such issue is raised by the defendants' answer. The bill itself is a proclamation of the complainant's business integrity. Throughout he extols the virtues of his methods. It, in substance, avers that the complainant's liquors have become exceedingly popular; that the names under which it was sold indicate to the trade, consumers, and to the public that the liquors manufactured, put up, and sold by the complainant are held in high public esteem because of their intrinsic worth and superior flavor; that he exercised the utmost care and skill in preparing the same, and had thereby reaped large profits; that he had expended large sums of money in extensively advertising it, and, as the evidence shows, by the means aforesaid; and in his testimony he paraded the care and caution he exercised in the selection and use of superior liquors in preparing them for the market, and the large trade he had built up, at great expenditure in advertising. As his promotion of his liquors on the market resulted from the character of his labels and advertising, and he put his trade-mark labels, placards, and advertisements in evidence, showing that throughout he represented that his liquors, in large degree, were of Nelson county, Ky., manufacture, it was directively responsive thereto for the defendant to show, by the cross-examination of complainant and otherwise, that these claims were false. This evidence was not only directly connected with, but was involved in, the very issues tendered in the bill and in the proofs submitted by the complainant.

These facts, doubtless, were unknown to the defendants until they developed in taking the depositions. This evidence having been heard, without objection from complainant, and being competent, it is in the case, and the defendants are entitled to avail themselves of it. It appears from the statement of the case in Krauss v. Jos. R. Peebles' Sons Company (C. C.) 58 Fed. 590, that the fact "was developed upon the hearing by the defendants that, up to and including most of the year 1891, Jas. E. Pepper & Co. bottled nothing in these cases of 'fives' under the gold label but Old Pepper Whiskey," etc., indicating that the fact was developed on the hearing.

As said by Justice Duer, in Fetridge v. Wells et al., 13 How. Prac. 388, 389 (which is cited with approval by Mr. Justice Shiras in Worden & Company v. California Fig Syrup Company, supra):

"The remarks that I have now made would suffice for the decision of this motion, were the only question that of the similarity of the trade-marks; but there is another, and a grave and important question, to which the counsel for the defendants have earnestly directed my attention. That question is, whether, even upon the supposition that all the material allegations in the complaint are true, the conduct and proceedings of the plaintiff and his firm have not been such as justly to preclude them from any claim to relief in a court of equity. This question, it is true, is not raised in the answer of the defendants, but it is raised by the facts which the affidavits and other papers before me have disclosed, and, in my opinion, it is emphatically the question that, as a judge in equity, I am bound to consider and determine."

The court further said:

"Those who come into a court of equity seeking equity must come with pure hands and a pure conscience. If they claim relief against the fraud of others, they must be free themselves from the imputation. If the sales made by the plaintiff and his firm are effected, or sought to be, by misrepresentation and falsehood, they cannot be listened to when they complain that by the fraudulent rivalry of others their own fraudulent profits are diminished."

Indeed, it seems to me that it would be a travesty upon justice if, in the progress of the hearing of the case presented by the bill, the fact should be disclosed that the complainant himself, in his trade-mark as registered, or in his labels, placards, and advertisements, was making false representations in pushing his goods on the market, the Chancellor, sitting in the forum of conscience, should fail to turn him out of court.

The prayer for an injunction is denied, and the bill is dismissed.