KENNEDY et al. v. CUSTER et al.

(Circuit Court of Appeals, Eighth Circuit. November 29, 1909.)

No. 2,735.

1. HUSBAND AND WIFE (§ 34*)—MARRIAGE SETTLEMENTS—EVIDENCE.
   Evidence *held* to sustain a finding that the making of an alleged antenuptial contract with reference to certain lands in controversy was not proved.

   [Ed. Note.—For other cases, see Husband and Wife, Dec. Dig. § 34.*]

2. EQUITY (§ 345*)—ANSWER UNDER OATH—BURDEN OF PROOF.
   Where a bill based upon an alleged antenuptial contract did not waive answer under oath, and the answer contained a sworn specific denial of the execution of the contract, the burden was on complainants to establish its execution by two witnesses, or by one witness with corroborating circumstances equivalent in weight to that of another.

   [Ed. Note.—For other cases, see Equity, Cent. Dig. § 722; Dec. Dig. § 345.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the Western District of Missouri.

Suit by Berney Kennedy and others against George W. Custer and another. Decree for defendants, and plaintiffs appeal. Affirmed.

Thomas A. Sherwood, Henry C. Young, and George B. Webster, for appellants.

Charles J. Wright (Edward M. Wright and James T. Blair, on the brief), for appellees.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge.

HOOK, Circuit Judge. This was a suit by Berney Kennedy and Emma K. Hacker against Sallie B. Custer to establish that the title of Eva Richards Kennedy, deceased, to a lot in Springfield, Mo., was acquired and held by her in trust for them. Upon final hearing the Circuit Court dismissed the bill. The complainants appealed.

R. F. Kennedy, the father of complainants, was married three times. Mrs. Hacker was born of the first marriage, and Berney Kennedy of the second. The third wife, Eva Richards Kennedy, died childless, and the defendant Mrs. Custer is her sole heir. The second wife died seized of the property in 1881, and by the laws of Missouri it passed to Berney Kennedy in fee, subject to an estate for life by the curtesy in R. F. Kennedy, his father. There was also at the time a small incumbrance upon the property. The case of complainants depended upon proof of the charge in their bill that when their father was about to marry Eva Richards an antenuptial contract was entered into which provided that the incumbrance on the lot should be foreclosed, and that she should acquire title in her own name, and hold it for her own use during life, and then for complainants, her prospective step-children, if she died without issue and they survived her. The incumbrance was foreclosed. Eva Richards, having then become Mrs. Kennedy, acquired title in 1887. She died without issue in 1904, and complainants survived her. R. F. Kennedy died in 1898.

The existence of the antenuptial contract was denied by the defendant, and therefrom arose the principal controversy of fact in the case. No such contract was ever made of record or produced, or its absence accounted for, at the trial, and the only testimony that one was actually entered into came from one of complainants' counsel, who testified that 19 years previously he prepared it and saw it signed. The deed to Eva Richards Kennedy from the sheriff acting as trustee in the foreclosure proceeding, was recorded in 1887, and remained unchallenged until after her death in 1904. During this period the property was openly treated as hers absolutely, and while she was alive no one appears to have questioned her complete title, or to have asserted that upon her death it would not pass to her heirs in the usual way.

We agree with the trial court that the proof on behalf of complainants was not of that clear, plain, and convincing character as would justify a court of justice in disturbing a title absolute in form that remained unchallenged for so many years, especially when the attack

is by the oral assertion of a contract after those claimed to have been parties to it have died. The security of titles ought not to be made to rest upon such insecure foundations. Howland v. Blake, 97 U. S. 624, 24 L. Ed. 1027; Coyle v. Davis, 116 U. S. 108, 6 Sup. Ct. 314, 29 L. Ed. 583; Moore v. Crawford, 130 U. S. 122, 134, 9 Sup. Ct. 447, 32 L. Ed. 878; Neely v. Boyd, 76 C. C. A. 142, 145 Fed. 172. The rule in such cases is similar to that which applies when fraud is charged. Mastin v. Noble, 85 C. C. A. 98, 157 Fed. 506.

This conclusion upon the proofs is also fortified by the condition of the pleadings. By the bill of complaint answer under oath was not waived. By the answer a specific denial of the execution of the antenuptial contract was accordingly verified, and this cast upon the complainants the burden of establishing their charge by the testimony of two witnesses, or of one witness with corroborating circumstances equivalent in weight to that of another. Vigel v. Hopp, 104 U. S. 441, 26 L. Ed. 765; Union Railroad Co. v. Dull, 124 U. S. 173, 8 Sup. Ct. 433, 31 L. Ed. 417; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678. The burden was not sustained by complainants.

The decree is affirmed.

NOTE.—The following is the opinion of Philips, District Judge, on the final hearing:

PHILIPS, District Judge. Simultaneously with the institution of this suit the complainant Emma K., then intermarried with Homer Sargent Hocker, instituted another suit in this court against said defendants, in which they seek to have reinstated a deed of trust executed to said Heffernan as trustee for said Emma K. Hocker, to secure a note of $3,000, executed by said R. F. and Eva R. Kennedy to said Emma in 1887, which said deed of trust was released by a deed of quitclaim from said Emma in 1892, which quitclaim deed is by said suit sought to be vacated and set aside. In taking the proofs concurrently the evidence applicable to the two cases is so commingled as to render the separation of the facts applicable to each somewhat difficult. The right of recovery in the case here under consideration is made to depend upon the existence of said marriage contract. The proof of the execution of this contract depends entirely upon the oral testimony of the witness F. S. Heffernan, one of the counsel for complainants. The bill does not waive answer under oath, but demands that the defendants be required to appear and answer unto the bill of complaint. Accordingly the defendants have appeared and made answer under oath that the contents of the answer are known to be true, except as such facts as are alleged to be upon information and belief.

The allegations of the bill as to the making and execution of the marriage settlement contract are distinctly and specifically denied in the answer. The general rule of equity pleading is that such answer under oath overcomes the allegations of the bill, and puts upon the complainant the burden of sustaining its controverted averments by the testimony of two witnesses, or one witness supported by additional corroborating circumstances, which, in the judgment of the chancellor, may be the equivalent of an additional witness. Carpenter v. Providence Washington Insurance Company, 4 How. 185, 217, 218, 11 L. Ed. 931; Latta v. Kilbourn, 150 U. S. 524, 14 Sup. Ct. 201, 37 L. Ed. 1169. This rule was applied by the Court of Appeals for the Fifth Circuit in Peeler v. Lathrop, 48 Fed. 780, 1 C. C. A. 93, to the instance where it was sought by the bill to affect an agent with a trust for rents collected, and the defendant answered under oath denying the essential averments of the bill. It was held that the answer was not overcome by the testimony of the complainants' solicitor, corroborated only by a letter from him to the defendant, not answered. The court said: "When the answer to a bill is required to be made,

and is made, under oath, and is responsive to the allegations of the bill, such allegations must, to entitle complainant to relief, be sustained by the testimony of two witnesses, or of one witness corroborated by circumstances which are equivalent in weight to the testimony of another witness"—citing 2 Story, Eq. Jur. par. 1528; Vigel v. Hopp, 104 U. S. 446, 26 L. Ed. 765; Railroad Company v. Dull, 124 U. S. 175, 8 Sup. Ct. 433, 31 L. Ed. 417; Development Co. v. Silva, 125 U. S. 249, 8 Sup. Ct. 881, 31 L. Ed. 678; Beals v. Railroad Co., 133 U. S. 295, 10 Sup. Ct. 314, 33 L. Ed. 608. See, also, Uri v. Hirsch (C. C.) 123 Fed. 568, 569, 570, 572.

It may be conceded that less proof may be required on behalf of the complainant where it appears from the oath to the answer that it is predicated of mere information and belief, or where it is apparent that the facts denied could not have been within the personal knowledge of the defendant. In such case very slight corroborative circumstances of the testimony of one witness may be accepted by the chancellor. But the situation and relation of the parties defendant in the case at bar to the Kennedys were of such character as to have enabled them to know much of their marital relations, justifying, perhaps, an affirmative oath to the answer denying the making of such contract.

The first question to be decided is: Was Heffernan a competent witness in any event to testify respecting said marriage contract? The statute of Missouri (section 4659, Rev. St. 1899 [Ann. St. 1906, p. 2539]), in force when the transaction occurred, declares that: "The following persons shall be incompetent to testify: * * * Third, an attorney, concerning any communication made by him to his client in that relation, or his advice thereon, without the consent of such client." The affidavit made to the complaint by said Heffernan distinctly states that he was the counsel who wrote the marriage contract, and during all the times stated in the bill of complaint he was counsel for said R. F. Kennedy; and in his testimony he says that he was attorney for R. F. Kennedy and Hannah L. Kennedy; that he examined the abstract of title from Mitchell to Hannah, as to its sufficiency; and that he advised them respecting the advisability of said Hannah making a will to provide therein for her said child, Berney Kennedy, and that he advised in lieu thereof that she make a deed direct to him (Berney); that she and her said husband expressed a feeling that he (Berney), at his majority, would give his sister (Emma K.) a one-half interest; that at the time of said R. F. Kennedy's engagement to said Eva Richards said Heffernan was consulted in relation to the marriage contract in question; and that he accordingly wrote the contract, which was given to him by R. F. Kennedy, with instructions to put the same in his safe, and that he was going to send it to his daughter Emma. He then proceeded to state that the conditions of the marriage contract, as he recollected them, were substantially as alleged in the bill of complaint. No question, therefore, can be made but that the relation of attorney and client existed between said Heffernan and R. F. and Eva Kennedy in the transaction respecting the making of the alleged marriage contract during all the alleged conversations had between them touching the same.

In Johnson v. Sullivan, 23 Mo. 474, the court held that the attorney employed to draft a certain deed by them, afterwards attacked for fraud, was incompetent to testify to any communications made to him on the occasion respecting the transaction, and, further, that it was immaterial "that any judicial proceedings should have been commenced or contemplated. It is enough if the matter in hand, like every other human transaction, may by possibility become the subject of judicial inquiry." Then, quoting from Greenleaf on Evidence as follows: "The great object of the rule seems plainly to require that the entire professional intercourse between client and attorney, whatever it may have consisted in, should be protected by profound secrecy. It has, therefore, been held that the attorney is not bound to produce title deeds or other documents left with him by his client for professional advice, though he may be examined to the fact of their existence in order to let in secondary evidence of their contents, which must be from some other source than himself"—the opinion then continues: "In Cormack v. Heathcote, 2 Brod. & Bing. 4, an attorney was called on to draw an assignment of goods. He refused, and the deed was drawn by another. The validity of the deed being questioned afterwards on the ground of fraud, the court of common

pleas held that the communication made to the attorney first called on was professional, and that evidence of the fraud through him could not be given. In Parker v. Carter, 4 Munf. (Va.) 286–287 (6 Am. Dec. 513) the Court of Appeals of Virginia said: 'This court understands it to be settled law that counsel and attorneys ought not to be permitted to give evidence of facts imparted to them by their clients when acting in their professional character; that they are considered as identified with their clients, and, of necessity, intrusted with their secrets, which, therefore, without a dangerous breach of confidence, cannot be revealed; and this obligation of secrecy continues always, and is the privilege of the client, and not of the attorney. The court is also of opinion that this restriction is not confined to the facts disclosed in relation to suits actually depending at the time, but extends to all cases in which a client applies to his counsel or attorney for his aid in the line of his profession. If the principle was confined to causes actually depending at the time, there would be no safety for a person consulting counsel as to the expediency of bringing a suit or of compromising one which is contemplated to be brought against him.'" See Gray v. Fox. 43 Mo. 570, 97 Am. Dec. 416.

In Alexander v. United States, 138 U. S. 358, 11 Sup. Ct. 350, 34 L. Ed. 954, the court, speaking to the question of the competency of an attorney to testify to communications made to him by his client, said: "If he consulted him in the capacity of an attorney, and the communication was in the course of his employment, and may be supposed to have been drawn out in consequence of the relations of the parties to each other, neither the payment of a fee nor the pendency of litigation was necessary to entitle him to the privilege. Williams v. Fitch. 18 N. Y. 546; Britton v. Lorenz, 45 N. Y. 51; Bacon v. Frisbie, 80 N. Y. 394, 36 Am. Rep. 627; Andrews v. Simms, 33 Ark. 771. In the language of Mr. Justice Story, speaking for this court in Chirac v. Reinicker, 11 Wheat. 280, 294, 6 L. Ed. 474: 'Whatever facts, therefore, are communicated by a client to a counsel solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent."

To escape this dilemma the learned counsel for complainants invoke the rule that when the client applies to the attorney for advice intended to facilitate a crime or fraud, or to guide him therein, the attorney being aware of his purpose, such communication is not privileged. The attitude of Mr. Heffernan in this connection is novel, to say the least of it. Plainly stated it is this: He accepted employment and compensation from Kennedy to concoct a scheme to defraud his (Kennedy's) children. He then brings suit, on a conditional fee, for said children to undo the fraud he advised and advanced, and offers himself as a competent witness to support the action. on the ground that he was guilty of professional stultification in the first instance. He ought not to be surprised if the chancellor should say to him: "Call another witness." But, as will be shown further on. no sufficient allegation is made in the bill of complaint. and there is no evidence to support the imputation of fraud in the original transaction. If his competency as a witness were conceded, what corroborative testimony, or circumstance equal to that of another witness, is furnished by this record to support his testimony? The complainant Emma was introduced as a witness, over the objection of defendant's counsel. As she was introduced to obtain testimony respecting the marriage contract affecting the title to the land acquired by inheritance by the defendant Sallie R. Custer as heir under Eva R. Kennedy, which she claims was made in her favor, was she a competent witness therefor, the said Eva R. and R. F. Kennedy being dead?

The statute of Missouri (section 4652 [Ann. St. 1906, p. 2520]), declares that "in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify, either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing. disqualification, shall be admitted to testify in his own favor, except as in this section is provided, and where an executor or administrator is a party, the other party shall not be admitted to testify in his own favor, unless the contract in issue was originally made with a person who is living and com-

petent to testify, except as to such acts and contracts as have been done or made since the probate of the will or the appointment of the administrator." The Supreme Court of Missouri, in construing this statute, has said: "The proposition may be taken as a general one that, where parties have contracted with each other, each may be supposed to have an equal knowledge of the transaction, and both, if living and sane, are allowed to testify; but if one is precluded by death or insanity, the other is not entitled to the undue advantage of being a witness in his own case." See Fulkerson v. Thornton, 68 Mo. 468; Looker v. Davis, 47 Mo. 140; Stanton v. Ryan, 41 Mo. 510; Chapman v. Dougherty, 87 Mo. 620–622, 56 Am. Rep. 469; Meier v. Thieman, 90 Mo. 442, 2 S. W. 435.

The reason of the rule would exclude the witness Emma K., as she is asserting a contract made by R. F. Kennedy and Eva R. Kennedy in her favor, as against the inheritor under the letter. On June 29, 1906, Congress by act (Act June 29, 1906, c. 3608, 34 Stat. 618 [U. S. Comp. St. Supp. 1909, p. 242]) amended section 858 of the Revised Statutes of the United States, so as to make it read as follows: "Sec. 858. The competency of a witness to testify in any civil action, suit, or proceeding in the courts of the United States shall be determined by the laws of the state or territory in which the court is held." The fact that under the conditions in which her testimony was taken she may have been a competent witness at the time is immaterial. The Supreme Court of this state, in construing said section of the state statute, holds that the witness' competency is to be determined by the law in force when the testimony is presented before the court at the hearing. O'Bryan v. Allen, 108 Mo. 227, 18 S. W. 892, 32 Am. St. Rep. 595; Messimer v. McCray, 113 Mo. 382, 21 S. W. 17. Under the order of this court designating George Pepperdine, Esq., as special master to take the testimony herein, he was only authorized to take and report the evidence. He was not empowered to pass on the competency of the witness or the admissibility of their testimony, or to make any findings of fact or conclusions of law. Not until the testimony was offered on the hearing before the court was there any one to entertain and pass upon such objections. Both in writing before the hearing, and at the hearing and in the brief of counsel for defendants, objection was made to the competency of the complainant as a witness. Even if the rule which has been applied elsewhere were recognized, that objections to the competency of witness should be made at the time of the taking of the testimony, which is predicated of the assumption that the matter of incompetency was then known to the adverse party, and, if not made, is deemed to have been waived, the rule would not apply to this instance, for the palpable reason that her disqualification did not then exist, but has supervened, and prior to the offer of her deposition in evidence.

The statute of Missouri (section 2906 [Ann. St. 1906, p. 1671]) provides that: "Every objection to the competency or credibility of a witness examined, or the competency or the relevancy of any question put to him, or of any answer given by him, may be made in the same manner and with the like effect as if such witness were personally present; and any failure to make such objection at the taking of the depositions, although the objecting party may be present, shall not [prejudice] his right to make such objection at the trial of the cause." Without determining whether the foregoing statute applies in this jurisdiction to testimony taken in the form of depositions in equity cases, I hold that the construction placed by the Supreme Court of the state on its statute, as to the time when the competency of a witness may be determined, controls this case.

If the competency of the complainant Emma K. as a witness be conceded, her testimony in respect of the marriage contract is ineffective. In violation of the rules governing the introduction of testimony, without any preceding question to disclose that she had any knowledge of the existence of the alleged marriage contract, her counsel bluntly asked her: "Now, did you learn of any marriage contract that was about to be made?" Over the objection that the question was leading, and that the witness was incompetent to testify, her testimony was substantially as follows: That she knew her father was conferring with Mr. Heffernan, but did not remember what kind of a contract he was conferring about. Then, without having the witness to state what the conversation she had was, she was asked if she learned from those conversations that any contract was to be written between her father and Eva Rich-

174 F.—62

ards. The objection to this was not and could not be ruled upon by the special master. She answered that she did. She said that her conversation was with her father, and that she did not remember whether she had any conversation with Mr. Heffernan. She was then asked if she remembered anything her father told her he was going to put in that contract, and her answer was that she did not. She was then asked if she remembered that her father said he was going to have certain matters in that contract whether Eva liked it or not, or words to that effect. She answered, "Yes." She was then asked if they were talking about this contract, and she answered that she was talking to him about his marriage and about settling and dividing the property. She said that she did not remember to have seen any contract, and that she had made a search therefor but did not find any. From which it is apparent that, but for the suggestion conveyed in the question put by her counsel, it would not be shown even a marriage contract of any kind was suggested. We must, therefore, look alone to the testimony of Mr. Heffernan as to the making of any such contract, and what its terms and provisions were.

In all the correspondence that ensued between R. F. Kennedy and his children there is not a tangible reference to the existence of said marriage contract. There is no evidence that either of the parties to the contract ever made any statement to any one respecting its existence. After the marriage between R. F. Kennedy and Eva Richards they dealt with the property as the absolute owners. They borrowed money and executed a mortgage thereon to secure its payment. They mortgaged an undivided one-half of it to Emma, one of the complainants herein, to secure the sum of $3,000, which in another suit, filed simultaneously herewith, she is seeking to enforce, thereby recognizing the title to be in the mortgagors.

If it were conceded that Heffernan was a competent witness, as the contract was not produced, and depended upon secondary evidence, resting in the memory of a single witness, who comes to speak of it about 19 years after the transaction, every consideration of justice demands that the complainants should be held to the proof of every essential particular and detail of the contract. The rule is aptly expressed in Calhoun v. Calhoun, 81 Ga. 91, 6 S. E., loc. cit. 913, as follows: "We think the proper rule in law in regard to the admissibility of secondary evidence is not only that plaintiff must show the existence of the deed, but he must show that it was properly executed. It is possible that the deed may have been written and signed by the grantor, and yet may never have been executed according to law." See, also, Dasher v. Ellis, 102 Ga. 830, 30 S. E. 544, 545; Smith v. Smith, 106 Ga. 303, 31 S. E. 762; Helton v. Asher, 103 Ky. 730, 46 S. W. 23, 82 Am. St. Rep. 601.

The statute of Missouri (section 4324, Rev. St. 1899 [Ann. St. 1906, p. 2373]), in force at the time this contract is alleged to have been made, declares that "all marriage contracts whereby any estate, real or personal, in this state, is intended to be secured or conveyed to any person or persons, or whereby such estate may be affected in law or equity, shall be in writing, sealed and acknowledged by each of the contracting parties, or proved by one or more subscribing witnesses." The relevant succeeding sections of this statute require that such contracts shall be acknowledged and proved in the same manner as deeds of conveyance for land, and that they shall be recorded with the certificate or proof of acknowledgment in the office of the recorder of the county where the land is situated, and when so recorded it shall, as to all property affected by it in the county, impart full notice to all persons of its contents, and no such contract shall be valid or affect any property except between the parties thereto and such as have actual notice thereof, until it shall be deposited for record, as therein prescribed. As it is not claimed that said contract was attested by two subscribing witnesses, it was invalid unless executed under seal of the parties. In Harley v. Ramsey, 49 Mo. 309, 310, it was held that, under the statute requiring a deed to be made by a commissioner under seal, the unsealed writing was invalid. So in State ex rel. West v. Thompson, 49 Mo. 188, it is held that an attachment bond was invalid for want of a seal.

The entire statement of Mr. Heffernan in his testimony respecting this issue is as follows: "Finally both (meaning R. F. Kennedy and Eva Richards) came to the office, and I wrote a contract that at that time was signed by both of them, and acknowledged and delivered to me by Mr. Kennedy, I think with

instructions to put it in my safe, which I did after it was signed and acknowledged by them. He said he was going to send it [to] his daughter Emma." He further stated that some time afterwards Mr. Kennedy came to his office and got the contract, and that he had not seen it since, and had supposed until after the death of Eva Kennedy that Mr. Kennedy had sent it to his daughter. As the burden of proof in this case rested upon the complainants to make out by this secondary evidence a written contract in exact accordance with the requirements of the statute, no inference can be indulged that because the parties signed and acknowledged the contract it was under seal. The complainants' case, therefore, should fail on this ground alone.

Beyond all this, the alleged marriage contract, as stated in the bill of complaint and in the testimony of Mr. Heffernan, is as incredible as it is incomplete. The bill does not set out any marriage contract in terms between the parties. The only recitation made as to the terms and provisions of the contract is "that the deed of trust, which was then a lien on said premises," etc., "should be permitted to become forfeited for the nonpayment of $235, the remaining amount due on same, and a sale was to be had thereunder," with a further recitation "that the property should be permitted to be sold under and by virtue of said deed of trust, by the sheriff of said county, as trustee, for the purpose of buying in said property in the name of Eva Richards, and the deed conveying the title to said real estate under said sale should be executed and delivered to the said Eva, who at said time would then become the wife of said R. F. Kennedy." It then proceeds to allege that it was further agreed "that, if children were born of said marriage, said children should inherit the property; but if there were no children born of said marriage, and the said Eva should survive Berney and Emma K. Morris, then the said property should be the property of said Eva absolutely, but if the said Berney and Emma K. survive the said Eva, then the title of said property should be vested in the complainants herein." In his testimony he only describes what the conditions of the marriage contract were, to the effect aforesaid. According to this version of the contract, it contained nothing but said conditions, without even stating that the consideration therefor was the contemplated marriage between the parties. If this marriage contract had been put to record, as it is described in the bill of complaint and in Heffernan's testimony, it would have been an anomaly, if not void for uncertainty.

The witness Heffernan testified that the reason assigned by R. F. Kennedy for not placing the marriage contract on record was that he did not want his creditors, in Indiana, to know that he had any interest in this property. Let us consider the reasonableness of this statement: At that time R. F. Kennedy had a life estate in this property by curtesy consummate as the surviving husband of Hannah. When she died, the record showed title vested in her. The estate in remainder then passed, as a vested estate, to Berney Kennedy. The life estate and the estate in remainder were an open book, accessible to any inquisitive creditor of R. F. Kennedy. How, therefore, would the recording of the marriage contract have made a creditor the wiser, or have increased the exposure to attack by any creditor? The marriage contract would give R. F. Kennedy no greater interest in the property. With or without the marriage contract a foreclosure of the mortgage and sale thereunder would extinguish any marital interest existing in R. F. Kennedy. Would not a lawyer have advised his client of all this? Is a chancellor to close up all the avenues of common sense, observation, and reasonable probability and sit like an automatic machine to register the "thus saith" the witness?

Another remarkable provision of the marriage contract, as described by Heffernan both in the bill and in his testimony, is the following: "If the said Berney and Emma K. survive the said Eva, then the title of said property shall be vested in the said complainants herein." According to this, to entitle the estate in remainder to pass from the line of descent under said Eva to the benefit of the complainants, it was made essential that both Berney and Emma K. should survive Eva. So that, if Eva had survived Emma, Berney would not get anything; or, if Eva survived Berney Emma would not get anything. It is incredible to the mind of a chancellor or to the common sense of a layman that a lawyer could have stood godfather to such an ill-shapen conception. As a posthumous creation of the mind it can easily be perceived,

when both Emma and Berney had survived Eva and the witness was intent on enabling both to recover, how he should have reproduced a contract conferring their right of action on the condition that both should survive Eva. But the natural antenuptial provision, readily occurring to the mind of a lawyer advising and drafting the instrument, would have been that if said Emma and Berney, or either of them, should survive the said Eva, then the title to said property should vest in the said survivors or survivor.

It is somewhat difficult, from the line of argument pursued by counsel for complainants, to comprehend precisely upon what theory they seek relief. Upon the theory of the execution of the marriage contract, and that in order to its effectiveness the mortgage on the lot in question should be foreclosed and bought in by said Eva, it would necessarily have to be affirmed that by virtue of the foreclosure sale and the sheriff's deed she acquired the title to the lot, which then became subject to the terms of the marriage contract; that by such foreclosure the estate of R. F. Kennedy, as a tenant by the curtesy consummate, was extinguished; and that, Eva dying without issue and being survived by the complainants, they became entitled, as the absolute owners, to the fee of the land. Therefore the proper allegation, in accord with that matter in the bill, would be that the marriage contract be established as a lost instrument, and the title affirmed in the complainants against the claim of the defendant Sallie R. Custer as heir at law of the said Eva R. Kennedy, deceased. Under this theory it certainly would not lie in the mouth of the complainant Emma to impeach the validity of the foreclosure proceedings and the apparent title acquired thereunder by said Eva, as otherwise she could claim no interest whatever in the property. And as to Berney Kennedy, while the marriage contract without his acquiescence and claim thereunder could not affect his estate in remainder as the heir of his mother Hannah, he could, if he so elected, stand upon the assertion of such inheritance, subject to the validity of the title so acquired by said Eva as the purchaser at the foreclosure sale. In such choice of action he would have been in position to attack the validity of said foreclosure proceedings, but would have been subject to the defense that his right of action therefor was barred by the statute of limitation, which began to run against him in 1893, when he attained his majority. But he joins his co-complainant Emma in asserting a right to relief under the provisions of the alleged marriage contract, and is therefore equally estopped with her from asserting any invalidity under the foreclosure sale.

No relief is asked against the foreclosure sale, but only that the marriage contract be established, and for the possession of the premises, and an accounting for the rents received by the defendants since the death of Eva R. Kennedy. And yet, singularly enough, the bill avers that "the object of said marriage contract and said foreclosure of said deed of trust was to divest the title to said real estate out of said Berney Kennedy and vest the same in said Eva R. Kennedy, without his knowledge or consent, and with intent to defraud said Berney out of his just rights; * * * that pursuant to the terms of said marriage contract and the scheme of fraud aforesaid, therewith as aforesaid connected, the said R. F. Kennedy caused said deed of trust to be foreclosed and said property sold," etc.

The bill of complaint does not seek to set aside the order of the court directing the sheriff to sell the property or to the sale. It does not even charge that the complainant Emma had no notice of the foreclosure of said deed of trust and the sale thereunder, as well it might, for in her letter of May 15, 1892, to her father she said: "Berney feels that he should have been informed when the property was transferred. He does not understand at all how it could have been put in Eva's name without his knowledge. * * * You might just as well have explained things fully to him from the beginning, for he will know just how they stand." Berney Kennedy did not even testify in the case to establish his allegation that he had no notice of the foreclosure proceedings. But the deed from the sheriff to Eva R. Kennedy was of record, which imparted public notice of the foreclosure sale, and constituted the initial period for the running of the statute of limitations.

But how can the complainants be heard in a court of equity to demand the establishment of the marriage contract, made effective by the foreclosure proceedings, and at the same time allege that it was vitiated by fraud? "Equity suffers no person to approbate and reprobate the same deed." Without any

sufficient foundation laid therefor, without any specifications as the predicate for such evidence, counsel for complainants have argued: (1) That Heffernan is rendered a competent witness to testify about the making of the marriage contract because he had advised his clients in the preparation of a scheme to defraud Berney Kennedy; (2) that the foreclosure sale was void because the mortgage debt was satisfied when the sale was made; and (3) because R. F. Kennedy, without the knowledge and consent of the complainant Emma, had Heffernan in her name procure the order of the state circuit court empowering the sheriff to sell the property under the mortgage. All this, it must be conceded, is at variance with the theory of the recognition and enforcement of the marriage contract, and is without sufficient allegations in the bill to support such an issue.

By iteration and reiteration the courts have declared the law to be that the proofs must be in accordance with the issuable allegations of the bill, and that proofs which go to matters not so specifically alleged "the court cannot judicially act upon, for the pleadings do not put them in contestation. * * * A party can no more succeed upon a case proved, but not alleged, than upon a case alleged, but not proved." Phelps v. Elliott (C. C.) 35 Fed. 461. As said in Newham v. Kenton, 79 Mo. 382, 385: "A party is not entitled to a judgment on a finding of facts different from any theory of the case set up in the petition or answer." See, also, Reed v. Bott, 100 Mo. 66, 12 S. W. 347, 14 S. W. 1089; Harrison v. Nixon, 9 Pet. 503, 9 L. Ed. 201; Boone v. Chiles, 10 Pet. 209, 9 L. Ed. 388.

Equally well settled is it that the mere employment in a pleading of epithets imputing fraud is a mere brutum fulmen. The facts constituting the fraud must be specifically set forth so the court can see on the face of the bill whether or not, in contemplation of law, they constitute fraud, and whether or not the relief sought is predicable of them. This rule has been aptly stated by Judge Sherwood in Hoester v. Sammelmann, 101 Mo. 619, 624, 14 S. W. 728, 730, as follows: "General allegations of fraud, or other general allegations, no facts being stated, are but legal conclusions, and for that reason are insufficient. To say that a man acted fraudulently or improperly, without specifying what he did, is equivalent to making the pleader the sole judge of the sufficiency of his pleadings, and substituting his judgment for that of the court. If the facts are stated, the legal conclusion follows as night follows day, and so no statement of what conclusion the law draws is necessary." See, also, Cella v. Brown, 144 Fed. 754, 75 C. C. A. 608.

The real predicate of the bill of complaint for relief is the existence of the alleged marriage contract and the right of the complainants to the property in question as the beneficiaries thereunder, claiming, necessarily, through the title acquired by Eva R. Kennedy under the sheriff's deed at the foreclosure sale, pursuant to the terms of the marriage contract. As that contract is not established by evidence to the satisfaction of the court, the bill of complaint must be dismissed. It is accordingly so ordered.